UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

KATE BELL, et al.,                    :
                    Plaintiffs        :         NO.: 1:08-CV-01563
                                      :
v.                                    :         (JUDGE MCCLURE)
                                      :         (MAGISTRATE JUDGE PRINCE)
THE CITY OF HARRISBURG,               :
CHARLES KELLAR, TINA                  :
MANOOGIAN-KING, and                   :
PIERRE RITTER,                        :
                    Defendants        :
                                      :

---

## REPORT AND RECOMMENDATION

Pursuant to an Order entered on June 9, 2010, Honorable Thomas Vanaskie referred defendants' pending Motion for Summary Judgment to the undersigned Magistrate Judge for the purpose of preparing a Report & Recommendation.

## I. Background

The several plaintiffs, now fifty-one in number, commenced this lawsuit against the City of Harrisburg and various of its officials on August 20, 2008 (Doc. 1), which arises out of a mass arrest on September 2, 2007. Their amended complaint (Doc. 3) contains seven claims of constitutional right, alleges infliction of irreparable injury, and requests a judgment for compensatory and punitive damages.

### (A) Facts of the case

The following facts central to the case are not in dispute. Over the Labor Day weekend of 2007, plaintiffs attended the "Seventh Annual Camp Out with the DJs" (campout), held on McCormick's Island in the Susquehanna River. (Doc. 76, ¶¶ 15, 1.)

On the morning of September 2, 2007, Christian Yanez learned about the campout and tried to swim to McCormick's Island. (*Id.* ¶ 34.) Mr. Yanez never made it. With cocaine and alcohol still in his system, Mr. Yanez lacked the strength or stamina to complete the swim and drowned. (*Id.* ¶¶ 34–35.) Harrisburg officials launched a search for Mr. Yanez, in the process learning for the first time about the campout on McCormick's Island. (Doc. 64, ¶ 2.)

In the hours following the Harrisburg officials' discovery of the campout, City officials and police officers took boats over to the island to inspect and investigate the situation. (*Id.* ¶ 5.) Upon arrival, the officials and officers discovered trees cut down, primitive pit toilets that had been dug, a lingering smell of herbicide in the air, and evidence of drug and alcohol use. (*Id.* ¶¶ 6–8.)

Police officials subsequently transported over one hundred attendees of the campout back to the mainland by boat. (*Id.* ¶ 9.) Upon arrival, Harrisburg police checked attendees' identification and ran a warrant search. (*Id.* ¶ 10.) Meanwhile, the police contacted the District Attorney's office to discuss what charges might be brought against the campout attendees, but received no guidance concerning whether the attendees violated any of Harrisburg's ordinances. (*Id.* ¶ 11.) The Director of Harrisburg's Parks and Recreation Department, Tina Manoogian-King, was the City official most knowledgeable about the ordinances pertaining to Harrisburg's parks. (*Id.* ¶ 12.) Director King reviewed the ordinances and highlighted the ones that she believed were violated by the campout attendees. (*Id.*) She gave her highlighted list to the police, who conducted their own review and concluded that there had been multiple violations of the ordinances. (*Id.* ¶ 13.) The police decided to charge the attendees with only one violation of the Harrisburg ordinances: the provision prohibiting attendance of an unpermitted gathering of twenty or more people in a city park. (*Id.* ¶ 14.)

Once the decision to charge the campout attendees was made, attendees who had proferred Pennsylvania identification were issued citations for a summary offense and released from custody.. (*Id.* ¶ 19.) Attendees who proferred out-of-state identification were issued citations and taken into custody. (*Id.*) These out-of-state attendees were handcuffed or leg-shackled and taken to the Harrisburg Police Station, where they were processed and placed in holding cells while awaiting arraignment. (*Id.* ¶ 20.)

At the arraignment, which took place within 48 hours,[1] a Magisterial District Judge set the out-of-state attendees' collateral at $1000, which, including court costs, required each attendee to tender $1051 in order to be released on their own recognizance. (*Id.* ¶ 22.) Some attendees were able to pay the full amount; others negotiated the collateral to a lower amount that they could afford; but many were unable to post the collateral. (*Id.* ¶ 23.) Those who could not pay were transferred to the Dauphin County Prison. (*Id.*)

The following hearing for the first group of out-of-state attendees led to the dismissal of the charges against them. (*Id.* ¶ 24.) During the same hearing, the charges against all other attendees were dismissed by agreement of counsel. (*Id.*)

*(B) Procedural history*

Plaintiffs quickly followed the filing of their original complaint on August 20, 2008 (Doc. 1) with an amended complaint on August 25 (Doc. 3). Defendants filed their answer on November 11, 2008. (Doc. 12.) Given the complexity of this case, a fair amount of attention was paid to scheduling and handling matters of discovery; however, for present purposes, much of these details can be glossed over. Defendants filed a motion for partial judgment on the pleadings on March 3, 2009 (Doc. 25), which was

---

[1]S*ee, e.g.*, *Stewart v. Abraham*, 275 F.3d 220, 228 (3d Cir. 2001) (citing *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)) (noting that a person arrested without a warrant has a right to have a neutral party review the probable-cause determination within 48 hours).

granted on March 5, 2010 (Doc. 56), dismissing with prejudice the claims of James DeFrancesco against all defendants. Shortly thereafter, on March 29, the parties stipulated to the dismissal of defendant Stephen Reed (Doc. 59), which was approved by the Court on March 30 (Doc. 60).

Now before the Court are cross-motions for summary judgment: defendants filed their motion on April 1, 2010 (Doc. 64), and the plaintiffs theirs on April 26 (Doc. 70). Both parties have properly submitted statements of facts (Docs. 64, 76, 80), and the Court has the benefit of thorough briefing on the issues (Docs. 65, 75, 81, 84, 87).

## II. Standard of Review

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v.*

4

*Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

**III. Discussion**

Plaintiffs' complaint alleges six violations of their constitutional rights suffered as a result of actions taken under color of state law which, if sufficiently established, are actionable under 42 U.S.C. § 1983: Count I for false arrest in the absence of probable cause; Count II for false arrest in the absence of a warrant; Count III for malicious prosecution; Count IV for selective prosecution and concomitant violations of their First Amendment rights to freedom of speech, expression, association, and assembly; Count V for excessive bail; and Count VI for violation of the right to travel. A seventh count

purports to hold the City of Harrisburg responsible for its agents' actions under a theory of municipal liability.

Of the four defendants in this suit, three of them are persons in the ordinarily understood meaning of the term: Charles Kellar, Chief of Police of the City of Harrisburg; Tina Manoogian-King, Director of the Department of Parks and Recreation for the City of Harrisburg; and Pierre Ritter, a Captain in the Harrisburg Police Department. Plaintiffs assert claims against Kellar and King in both official and individual capacities; the claims against Ritter are in his official capacity only.

Several of plaintiffs' claims share common issues and. In the interest of efficiency and avoidance of needless redundancy, the analysis proceeds topically where appropriate, rather than making a linear march through the seven counts of the complaint.

### (A) Merger of claims against municipal officers sued in their official capacities with claims against the municipality

When a public servant is sued "in his official capacity," a judgment against him "imposes liability on the entity that he represents provided . . . [that] the public entity received notice and an opportunity to respond." *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985). An official-capacity suit is "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). Accordingly, a suit against a municipal official is no different from a suit against the municipality itself. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70–71 (1989) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *Monell*, 436 U.S. 690 n.55) (explaining that a suit against a state official is equivalent to a suit against the State itself); *id.* at 71 (holding that officials acting in their official capacities are not "persons" under § 1983).

As a party to this suit, the City of Harrisburg has received notice of the complaint and has availed itself of the opportunity to respond. To the extent that plaintiffs makes

claims against Kellar and King in their official capacities, those claims should be treated as claims against the City of Harrisburg. Because this treatment results in duplicate claims against the City, it is recommended that those claims agains Kellar, King, and Ritter be dismissed.

*(B) Probable cause*

The issue of probable cause relates to several of the plaintiffs' claims, most particularly those for false arrest and malicious prosecution. A central element of a claim of false arrest under § 1983 is a showing that the arresting officers lacked probable cause. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)). Likewise, a claim of malicious prosecution fails if the plaintiff cannot establish a lack of probable cause. *Johnson v. Knorr*, 477 F.3d 75, 81–82 (3d Cir. 2007) (citing *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003) (listing the elements of a malicious-prosecution claim).

(1) Legal standard

"Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (citing *Beck v. Ohio*, 379 U.S. 89, 89 (1964)). The constitutional validity of the arrest turns on "the facts available to the officers at the moment of arrest." *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) (quoting *Beck*, 379 U.S. at 96) (internal quotation marks omitted). The validity of the arrest itself, on which the constitutional probable-cause analysis is based, is a matter of state law. *Myers*, 308 F.3d at 255 (citing *Ker v. California*, 374 U.S.

23, 37 (1963)). The arresting officers need only "some reasonable basis" to believe that the person being arrested has committed a crime. *Barna*, 42 F.3d at 809.

### (2) Status of McCormick's Island as a park

Plaintiffs offer two arguments to support their claim that defendants lacked probable cause for arresting the campout attendees: first, that McCormick's Island is not a park, and so there was no reasonable basis for the officers to believe that plaintiffs were violating park ordinances; and second, that defendants had made no "individualized" assessment of each arrestee's culpability. *See Whren v. United States*, 517 U.S. 806, 817–18 (1996) (discussing the need for a "quantum of individualized suspicion" in the context of traffic stops (quoting *Delaware v. Prouse*, 440 U.S. 648, 654–55 (1979))). They argue alternatively that the dispute over the existence of probable cause presents questions of fact that should preclude summary judgment for defendants on this issue.

Defendants respond by pointing out that because plaintiffs admit to having attended the unpermitted campout on McCormick's Island, the only question remaining is whether the Island is a park, which defendants argue it is according to the plain language of the controlling ordinance.

Unfortunately for plaintiffs, their argument that McCormick's Island is not a park is a losing one. Harrisburg's municipal ordinances define a "park" as "a park, reservation, playground, recreation center or any other area in the City, owned or used by the City, and devoted to active or passive recreation or leisure activity." Harrisburg, Pa., Code § 10-301.1(c). The ordinance authorizing the City of Harrisburg's acceptance of McCormick's Island states that the island is one of two "in the Susquehanna River tendered by James McCormick, Esquire, for public park purposes." Harrisburg, Pa., Ordinance 42 (July 3, 1912). Harrisburg was to take ownership of the islands "upon the conditions stipulated"; the ordinance twice specifically refers to the islands being "for public park purposes." *Id.*

A common-sense reading of these two documents—both of which are in the public record—leads to one conclusion: that McCormick's Island satisfies Harrisburg's definition of "park."

Under Harrisburg's ordinance, a particular plot of land is a park if it satisfies three requirements: (1) that it is a "park, reservation, playground, recreation center or any other area in the City"; (2) that it is owned or used by the City; and (3) that it is "devoted to active or passive recreation or leisure activity." There is no dispute either that McCormick's Island is an "area in the City" or that it is owned by the City; the only disagreement is over whether the Island is "devoted" to recreation or leisure activity. Yet in their response to defendants' statement of facts, plaintiffs emphasize that Harrisburg "promotes unrestricted public use of McCormick['s] Island as part of the Susquehanna River Trail" and that the Island is "to be used for public enjoyment." (Doc. 76, at 8.) Combine these factual claims with the 1912 ordinance stating that Harrisburg took title to McCormick's Island "for public park purposes" and an argument that McCormick's Island is outside of Harrisburg's broad definition of "park" becomes impossible to maintain.[2] According to the plain language of the ordinances in question, that the City owns the Island "for public park purposes" excludes the possibility of any kind of industrial, commercial, or residential development, and leaves no possible use of the land except recreational or leisure activities.

---

[2]Defendant King's various statements about McCormick's Island provide no support for the contrary position. Although she testified that the Island is "not really devoted, I mean, McCormick [sic] Island doesn't exist for [leisure or recreational purposes]" and referred to the Island by at least a half dozen different descriptive terms (Doc. 76, at 13), King's opinion is irrelevant to the legal status of the Island. Regardless of her position as Director of Parks and Recreation, her testimony has no power to override or alter the conditions under which Harrisburg took title to McCormick's Island.

### (3) Permitting requirements

Because McCormick's Island is a park, the inquiry then turns to the issue of permitting. The section of Harrisburg's ordinances relating to permit requirements states that "[n]o person shall . . . participate in . . . any assembly or group of twenty or more persons . . . in any park unless a permit therefor has been obtained from the Director and unless such permit is carried by the person heading or leading such activity." *Id.* § 10-301.20(a). It is undisputed that the campout was unpermitted, that there were more than twenty persons in the group of attendees, and that the plaintiffs were among the attendees at the campout. The facts of the case and the plain meaning of the ordinance indicate that a permit was required and should have been carried by the leader of the campout.

### (4) Degree of criminal culpability required

Plaintiffs argue that even if a permit was required, they lacked the necessary mens rea to establish a statutory violation. They point to 18 Pa. Cons. Stat. Ann. §§ 301–302 (1973) in support of their argument; section 302(c) states that when the degree of culpability required "to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly[,] or recklessly with respect thereto." According to their argument, this default standard of culpability applies because the Harrisburg park ordinances prescribe no other standard. Recklessness, the lowest of the three degrees of culpability listed in section 302(c), consists of an individual "consciously disregard[ing] a substantial and unjustifiable risk that the material element exists or will result from his conduct." *Id.* § 302(b)(3). Plaintiffs imply that because they "did not intend to participate in an unpermitted, and allegedly illegal event," they were not reckless in their attendance and participation, and could not properly have been arrested for violating the permit ordinance. (Doc. 84, at 9.)

However, defendants point out that the default standards of culpability in section 302 are explicitly limited by the provisions of section 305. 18 Pa. Cons. Stat. Ann. § 302(a). Under section 305, culpability requirements are inapplicable to either summary offenses, *id.* § 305(a)(1), or offenses defined by statutes other than Title 18, *id.* § 305(a)(2). Defendants correctly explain that by violating Harrisburg's permitting ordinance, § 10-301.20(a), plaintiffs committed summary offenses that were not defined by Title 18 of Pennsylvania's statutes. *See* 18 Pa. Cons. Stat. Ann. § 3304(b) (defining summary offenses). The applicability of section 305(a)(1) defeats application of section 302(c), thus obviating any need that defendants would otherwise have had to conduct an "individualized" assessment of each arrestee's mens rea; mens rea is not a required element of a violation of the permit requirements. The knowledge that each arrestee was on the Island and in attendance at the unpermitted campout was all the individualized knowledge that they needed.

### (5) First Amendment claim

Plaintiffs' constitutional argument, claiming that the parks ordinances are impermissibly vague and violative of the First Amendment, never gets off the ground. They are, of course, correct in urging that "[n]o one may be required at peril of life, liberty[,] or property to speculate as to the meaning of penal statutes." *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)) (internal quotation marks omitted). Yet the tortuous logic of their argument abandons the common sense that they claim the ordinances lack. They highlight testimony showing defendants' lack of a clear definition of the term "park" as though that were evidence of the legal definition of the term, and meanwhile provide no textual analysis of the ordinance itself. They protest that "[n]o person reading the assembly provisions of the Parks Ordinances would interpret them to require every single person at an event to have

a permit to be there" (Doc. 75, at 15), and yet this reading is the one on which they based their constitutional argument. Indeed, there is no evidence that anyone but plaintiffs, in their argument, has read the ordinance this way; the ordinance states that "[n]o person shall . . . participate in . . . any assembly or group of twenty or more persons . . . unless a permit therefor has been obtained from the Director and unless such permit is carried by the person heading or leading such activity." Harrisburg, Pa., Code § 10-301.20(a). The only unstrained reading of this language is that a single permit is required: the ordinance refers to "permit" in the singular, and in another singular reference, requires that "the person heading or leading" the activity carry it. What the ordinance prohibits is the attendance of an unpermitted event—not the attendance at an event without a permit for each individual attendee. The arguments before the Court today fail to persuade that the ordinances in question are either vague or excessively burdensome on First Amendment rights.

(6) Conclusion

Defendants had probable cause to arrest the plaintiffs. The arresting officers reasonably relied on King's statement that the Harrisburg parks ordinances applied to the attendees. *See United States v. Yusuf*, 461 F.3d 374, 378, 384–85 (citing, *e.g.*, *United States v. Ventresca*, 380 U.S. 102, 111 (1965); *United States v. Davis*, 557 F.2d 1239, 1247 (8th Cir. 1977)) (reviewing case law that supports law-enforcement officers' reliance of the statement of other government officials). Further, the record reveals that at the time of the arrest, the officers knew that the campout was unpermitted and there were more than twenty attendees. It is true that probable cause requires "some quantum of individualized suspicion" for each arrestee, *United States v. Martinez-Fuerte*, 428 U.S. 543, 560 (1976), but the mere fact that the "individualized suspicion" for each arrestee was the same in this case does not prevent this requirement from being met. Because the

officers had knowledge of all factual circumstances necessary to support probable cause for arrest, plaintiffs cannot successfully argue that probable cause was lacking.

Plaintiffs insist that they could not have known that McCormick's Island was a park that required a permit for group use, but the public record contains both the ordinance explaining the Island's uses and the plainly worded ordinances defining a "park" and permitting requirements. The City of Harrisburg is under no obligation to ensure that all the members of the public who might wish to make use of its lands are fully conversant with the laws that apply to them. The City need only ensure that the pertinent information is publicly available. The duty of self-education falls upon those who choose to avail themselves of public resources, and those who proceed in ignorance do so at their own risk.

Because plaintiffs' claims for false arrest and retaliatory prosecution cannot succeed without a showing that probable cause was absent from the arrest—a showing that they cannot make—it is recommended that summary judgment be granted for defendants on these two claims.

### (C) Warrantless arrest

Plaintiffs claim that their Fourth Amendment right to be free from unreasonable seizures was violated when they were arrested and subsequently jailed by defendants on the basis of their out-of-state residency while in-state residents were issued citations and released, when both in-state and out-of-state residents were charged with the same summary offense. Plaintiffs further claim that this discrimination based on state residency violated their constitutional right to travel.

(1) The custodial arrest under the Fourth Amendment

As stated above in the discussion of probable cause, the validity of an arrest in a Fourth Amendment analysis is determined by the law of the state in which the arrest occurred. *Wright v. City of Philadelphia*, 409 F.3d 595, 601 (3d Cir. 2005) (citing *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002)). The Pennsylvania Rules of Criminal Procedure require that when a defendant has been arrested without a warrant, the defendant shall be promptly released from custody if "(1) the defendant poses no threat of immediate physical harm to any other person or to himself or herself; and (2) the arresting officer has reasonable grounds to believe that the defendant will appear as required." Pa. R. Crim. Pro. 441(B)(1), (2) (2005).

The comments to Rule 441 explain that "reasonable grounds to believe that the defendant will appear" includes "such things as concerns about the validity of the defendant's address, the defendant's prior contacts with the criminal justice system, and the police officer's personal knowledge of the defendant." *Id.* cmt. The previous version of Rule 441 had also listed, as a factor to consider in the reasonable-grounds inquiry, whether the defendant was a resident of Pennsylvania. 35 Pa. Bull. 3901, 3907 (July 16, 2005). In the discussion of the 2005 amendments to Rule 441, the Criminal Procedural Rules Committee (Committee) noted that the reference to residency was deleted as "unnecessary" because it was a criterion used "when making a judgment whether there are reasonable grounds to believe the defendant will appear as required." *Id.* at 3916 (discussing Rule 519); *see id.* at 3915 (indicating that the discussion of Rule 519 applies to the amendments to Rule 441). Given the Committee's explanation of the 2005 amendments, which, although not controlling, are "effective aids" in construing the Rules of Criminal Procedure, this analysis will proceed on the postulation that defendants were permitted to use plaintiffs' residency as a criterion in deciding whether plaintiffs were likely to appear. *Commonwealth v. Ferrari*, 376 Pa. Super. 307 307, 317 (1988),

*overruled on other grounds as recognized by Commonwealth v. Stroud*, 699 A.2d 1305, 1310 (Pa. 1997).

Defendants insist that they acted lawfully when they jailed plaintiffs solely on the basis of their out-of-state residency. The appellate case that they cite in support of their argument upheld custodial arrest of the appellant–arrestee because at the time of the arrest, the appellant had no identification. *Commonwealth v. Williams*, 390 Pa. Super. 493, 501 (1990). The court reasoned that since the appellant's identity was unverified, "there was no way to guarantee that a summons would indicate appellant's true identity" or that there would be any way for the arresting officer "to locate appellant to pursue the charge if appellant failed to appear in response to the summons on the appointed day." *Id.* Because there was no way to "ensure compliance with a citation" in the absence of the appellant's confirmed identification, the court concluded that arrest was the only proper course of action. *Id.* "Had [the officer] not elected to arrest appellant," the court explained, "his actions would have been tantamount to releasing appellant without charge." *Id.* at 501–02.

Plaintiffs respond by highlighting the introduction to the Rules of Criminal Procedure, which notes the "minor nature of summary offenses," indicating the intention that a defendant would receive a citation, rather than be subjected to a full custodial arrest, "except in exceptional circumstances." Pa. R. Crim. Proc. ch. 4 *Committee intro*. The introduction continues with the observation that "most defendants will obey summary process in summary cases," so the procedures "are generally designed to favor the least intrusive means of instituting a summary proceeding." *Id.* Plaintiffs maintain that the full custodial arrest failed to satisfy the Fourth Amendment's basic requirement of reasonableness when making seizures. *United States v. Banks*, 540 U.S. 31, 35 (2003).

From a state-law perspective, the question is whether the arresting officers had reasonable grounds to believe that the arrestees would appear when summoned. In an

15

analysis of Rule 441, the procedural rule governing the situation, the critical phrase "reasonable grounds" is undefined, and the Court can find no interpretations among published Pennsylvania cases. However, Pennsylvania law appears to consider "reasonable grounds" generally equivalent to "probable cause," *e.g.*, *Commonwealth v. Fulton*, 921 A.2d 1239, 1240 n.2 (Pa. Super. 2007) (quoting *Martin v. Commonwealth*, 905 A.2d 438, 450 (Pa. 2006) (Eakin, J., concurring)), except in the context of traffic stops for driving under the influence of alcohol, *e.g.*, *Stein v. Commonwealth*, 857 A.2d 719, 723 (Pa. Cmwlth. 2004). Several other states similarly equate "reasonable grounds" with "probable cause." *E.g.*, *People v. McCay*, 10 P.3d 704, 706 (Colo. App. 2000); *State v. Johnson*, 944 A.2d 297, 309 (Conn. 2008); *People v. Lee*, 828 N.E.2d 237, 244 (Ill. 2005); *Bruch v. Kan. Dept. of Revenue*, 148 P.3d 538, 547 (Kan. 2006); *Trask v. Devlin*, 788 A.2d 179, 182 (Me. 2002); *Hawkins v. Dir. of Revenue*, 201 S.W.3d 340, 343 (Mo. Ct. App. 1999); *Hoover v. Dir., N.D. Dep't of Transp.*, 748 N.W.2d 730, 735 (N.D. 2008); *State v. Avery*, 13 P.3d 226, 244 (Wash. App. 2000). Consistent with this general approach, "reasonable grounds" and "probable cause" will be treated synonymously.

Rule 441, then, requires an arresting officer to release an arrestee upon issuance of a citation, rather than take the arrestee into custody, if "reasonably trustworthy information or circumstances within a[n arresting] officer's knowledge" is "sufficient to warrant a person of reasonable caution to conclude" that the person being arrested would be likely to appear as required. *See United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The test for whether such reasonable grounds exist "is an objective one, based on 'the facts available to the officers at the moment of arrest.'"*Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) (quoting *Beck*, 379 U.S. at 96).

There is no dispute that out-of-state attendees of the campout were issued citations and then taken into custody. Defendants averred in their Statement of Facts, with proper

citations to the record, that "[p]olice officials were aware that if non-residents did not appear for their summary hearings, extradition would not occur in their resident states." Plaintiffs did not deny this averment, which is therefore deemed admitted. Fed. R. Civ. P. 8(b)(6). At the time of the arrest, defendants knew that (a) plaintiffs had presented identification establishing their residency in states other than Pennsylvania and (b) as a result of their out-of-state residency, plaintiffs would not be subject to extradition for the charged summary offenses and would be effectively beyond the reach of Pennsylvania law. If they were not arrested, plaintiffs could have avoided the summons of the Magisterial District Judge without consequence, which would have been equivalent to releasing them without charge. *See Commonwealth v. Williams*, 390 Pa. Super. 493, 501–02 (1990) (concluding that "[n]either law nor reason could justify such a result"). Because a person of reasonable caution in defendants' position could have concluded that plaintiffs were not likely appear when summoned, defendants' arrest of plaintiffs was in compliance with Rule 441. Defendants thus conducted themselves in accordance with the Fourth Amendment's proscription of unreasonable seizures.

### (2) Right to travel under the Equal Protection clause

Plaintiffs claim that their constitutional right to travel was violated because they, out-of-state residents, were subjected to full custodial arrest whereas in-state residents were issued a citation and then released. They remind the Court that when the right to travel is penalized, a cause of action arises, and the law that imposes the penalty is analyzed under strict scrutiny. *Maldonado v. Houstoun*, 157 F.3d 179, 186 (3d Cir. 1998); *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 100 (2d Cir. 2009). Under strict scrutiny, a law must be struck down if it is not "narrowly tailored to serve a compelling government interest," *Selevan*, 584 F.3d at 100, a standard of review that plaintiffs insist Rule 441 cannot withstand.

The flaw in plaintiffs' argument is that none of the cases they cite as authority stand for the proposition that an out-of-state resident suffers a violation of constitutional rights upon traveling to another state, breaking the laws of the state, and then being detained there. The Equal Protection cases that they cite relate to new residents that have migrated from other states and residency requirements that deny them benefits comparable to those of longer-term residents.

The seminal case in right-to-travel jurisprudence, *Shapiro v. Thompson*, involved a claim by a single mother whose application for state financial aid was denied solely because she had been a resident of the state for less than a year. *Shapiro v. Thompson*, 394 U.S. 618, 623 (1969), *overruled in part on other grounds*, *Edelman v. Jordan*, 415 U.S. 651 (1974). Another case that plaintiffs cited involved a challenge to a provision of Pennsylvania's welfare program that gave less financial aid to newly arrived residents of the state. *Maldonado v. Houstoun*, 157 F.3d 179, 181–82 (3d Cir. 1998). *See also Michael C.* ex rel. *Stephen C. v. Radnor Twp. Sch. Dist.*, 202 F.3d 642, 654–55 (3d Cir. 2000) (addressing the right of new residents to be treated like citizens of that state). Plaintiffs correctly cite valid authority for the proposition that "[a] state action implicated the right to travel only if it 'penalize[s]' those residents who have recently entered the state." *Karan v. Adams*, 807 F. Supp. 900, 906 (D. Conn. 1992) (citing *Dunn v. Blumstein*, 405 U.S. 330, 338 (1972)) (second alteration in original). But the following sentence in *Karan* notes that "a state acquires the burden of meeting the compelling-interest standard only when it singles out recent *migrants*" and penalizing them somehow. *Id.* (quoting *Dunn*, 405 U.S. at 340) (emphasis added). The line of cases addressing state-law residency requirements does nothing to help plaintiffs because they did not migrate to Pennsylvania.

Case law that addresses the intersection between equal-protection jurisprudence and criminal activity tends to support defendants' position. The Supreme Court has held that "even before trial and conviction, probable cause may justify an arrest and

18

subsequent temporary detention," despite the fundamental nature of the right to travel. *Jonas v. Helms*, 452 U.S. 412, 419 (1981). A citizen may not, "if a fugitive from justice, claim freedom to migrate unmolested"; transgressions of a state's laws "warrant any public authority in stopping a man where it finds him and arresting his progress across a state line quite as much as from place to place within the state." *Id.* at 419 n.15 (quoting *Edwards v. California*, 314 U.S. 160, 184 (1941) (Jackson, J., concurring)). *See also United States v. Rodriguez-Rosario*, 845 F.2d 27, 29 (1st Cir. 1988) (holding that arrest and detention that comply with the Fourth Amendment do not give rise to a right-to-travel claim).

Although there is little case law that directly addresses the effect that arrest and detention have on the constitutional right to travel, the current jurisprudence tends to undercut plaintiffs' claimed violation and to be consistent with defendants' claimed lawfulness. In the absence of clear authority showing that a full custodial arrest, supported by probable cause, burdens an out-of-state citizen's right to travel, the best conclusion is that defendants' arrest of the plaintiffs was fully lawful, and plaintiffs' Equal Protection claim fails.

### (D) Excessive bail[3]

Plaintiffs argue that the $1051 bail demanded for their release when they were arrested was so excessive as to violate the Eighth Amendment. Although they admit that none of the defendants had bail-setting authority, they maintain that defendant Ritter "manipulated, helped to shape, or exercised significant influence over the bond decision." *Brown v. Brown*, No. 05-1130, 2008 U.S. Dist. LEXIS 18874, at *23–24 (E.D. Pa. Mar. 11, 2008) (citing *James v. York County Police Dep't*, 160 Fed. Appx. 126, 133 (3d Cir. 2005)). Defendants respond that there is no evidence showing that Ritter influenced the

---

[3]Plaintiffs have voluntarily discontinued their excessive-bail claims against defendants Tina King, Charles Kellar, and the City of Harrisburg. (Doc. 75, at 22 n.4.)

magisterial district judge's setting of bail, and that the choice to set bail at the maximum of $1000, plus $51 in court fees, was within the discretion that Pa. R. Crim. P. 452(A) affords the judge.

Pennsylvania law reserves bail-setting authority to the magisterial district judge (MDJ) or other judge that has jurisdiction over the case. Pa. R. Crim. P. 103. However, the statutory grant of authority is not dispositive in an analysis of how bail was actually set; a party's mere lack of statutory authority "does not provide an impenetrable shield" to a claim that the party affected the amount of bail. *Wagenmann v. Adams*, 829 F.2d 196, 211–12 (1st Cir. 1987). Accordingly, in this case, Ritter may be liable for setting excessive bail if plaintiffs can show that he did manipulate, help to shape, or exercise significant influence over the MDJ's decision.

Yet the issue of Ritter's influence is a moot one if there are no grounds upon which to find that $1051 was an unreasonably high bail to set for the plaintiffs. The base amount of collateral, $1000, was within the limits prescribed by the ordinance. Harrisburg, Pa., Code § 1-301.99. Several of the plaintiffs were unable to pay the full $1051; although some managed to get the bail reduced to $500, many did not, and spent upwards of twenty-four hours in jail. But a given bail setting "is not constitutionally excessive merely because a defendant is financially unable to satisfy the requirement." *United States v. McConnell*, 842 F.2d 105, 107 (5th Cir. 1988) (citing, *e.g.*, *United States v. James*, 674 F.2d 886 (11th Cir. 1982)).

The litmus test for whether bail is set appropriately is to determine whether it was set "in an amount greater than that required for reasonable assurance of the presence of the defendant." *Id.* (citing *Stack v. Boyle*, 342 U.S. 1, 4 (1951)). Yet plaintiffs nowhere provide any argument that the amount of bail was greater than required. In their complaint, they merely call attention to the fact that the bail was set to the maximum amount,. (Doc. 3, ¶ 124.) Their brief opposing defendants' motion for summary

judgment, and supporting their own cross-motion, contains no argument at all—only a reference to a statement of law in defendants' brief and a "respectful[] suggest[ion]" that Ritter's alleged conversation with the MDJ is enough for Ritter to be held responsible for the imposition of excessive bail. (Doc. 75, at 22.)

Because there is no dispute that the bail was set at $1051 for each plaintiff, and because plaintiffs have made no arguments and cited no cases that would support a finding that the bail of $1051 was constitutionally excessive, it is recommended that summary judgment be granted for defendants on plaintiff's Eighth Amendment claim.

### (E) Municipal liability

A claim of municipal liability can only be based on a deprivation of a constitutional right. 42 U.S.C.A. § 1983 (West 2010); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–95 (1978); *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1059 (3d Cir. 1991). As the foregoing analysis shows, plaintiffs are unable to successfully make out any claims of constitutional right, thus leaving their municipal-liability claim without any foundation and dooming it to failure. It is recommended that summary judgment be granted for defendants on the issue of municipal liability.

### (F) Qualified immunity for officers sued in their individual capacity

Defendants Kellar and King have asserted the affirmative defense of qualified immunity, which is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Because of the risk of losing this entitlement, it is important to resolve questions of qualified immunity as early as possible in the litigation.

There are two inquiries that a court must make in determining whether a defendant is entitled to qualified immunity. One is whether the facts as alleged in the complaint make out a violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second question is whether "the right was clearly established . . . in light of the specific context of the case." *Id.* Although the Supreme Court had until recently required that these two questions be addressed strictly in the order presented, this requirement has been relaxed, and lower courts may now "exercise their sound discretion in deciding which of the two prongs of the qualified-immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S. Ct. 808, 815–17 (2009).

Qualified immunity serves as a shield from suit if the defendant official could have reasonably believed that the actions in question were lawful in light of clearly established law and the information the defendant possessed at the time. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Officials who "reasonably but mistakenly" conclude that their actions were lawful are still entitled to immunity. *Id.* This standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 229 (citing *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

There is no dispute Kellar and King were officials of the City of Harrisburg at the time of the incidents giving rise to the complaint in this matter. Because the constitutional claims that plaintiffs make in this case fail as a matter of law, it is fair to say that the constitutional rights that they claim were not "clearly established" at the time. At the least, King and Kellar could have reasonably believed that their actions were lawful, and there is no evidence to suggest that King or Kellar were, at any time, knowingly violating the law. Accordingly, there is no need in this context to examine the allegations of the complaint. Both King and Kellar are entitled to qualified immunity, and it is

recommended that summary judgment be granted for defendants on the claims against King and Kellar in their individual capacities.

*(G) Punitive damages*

A jury may impose punitive damages in a § 1983 case "when the defendant's conduct is shown to be motivated by an evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Punitive damages are assessed only when there is an underlying successful claim that merits an award to the plaintiff. Since plaintiffs have no meritorious § 1983 claim upon which to predicate the imposition of punitive damages, it is recommended that their request for punitive damages be denied.

## IV. Conclusion

It is recommended, therefore, that defendants' motion for summary judgment be granted on all counts; that plaintiffs' motion be denied on all counts; and that plaintiff's complaint be dismissed.

s/ William T. Prince

William T. Prince

United States Magistrate Judge

June 28, 2010